# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Wayne R. Andersen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 1 C 4305 | DATE | 3/8/2004 |
| CASE TITLE | Phelps Dodge Corporation vs. Schumacher Electric Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] **Enter MEMORANDUM, OPINION AND ORDER: We grant the plaintiff's motion for summary judgment [22-1] and deny the defendant's cross-motion for summary judgment [23-1]. The Court orders the defendant to pay $372,226.56 plus interest. This is a final and appealable order. This case is hereby terminated.**
(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | MAR 0 9 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | 28 |
| ✓ | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | MAR 0 9 2004 date mailed notice | |
| TSA | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| PHELPS DODGE CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 01 C 4305 |
| v. ) | |
| ) | Wayne R. Andersen |
| SCHUMACHER ELECTRIC CORPORATION, ) | District Judge |
| ) | |
| Defendant. ) | |

## MEMORANDUM, OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment of plaintiff, Phelps Dodge Corporation, and defendant, Schumacher Electric Corporation. For the reasons stated below, the Court grants the plaintiff's motion and denies the defendant's motion. The defendant is ordered to pay $372,226.56 plus interest.

## Factual Background

Plaintiff Phelps Dodge Corporation ("Phelps Dodge") has sued defendant Schumacher Electric Corporation ("Schumacher") to enforce a guaranty by a Schumacher officer for payment of any purchases of copper wire by Horning Wire Corporation, a third party. Phelps Dodge operates several mining, manufacturing and distribution businesses and is a large producer of copper. Schumacher is a private, closely held corporation that manufactures and distributes battery charging equipment and transformers, both of which use copper wire as a principal component. Schumacher was founded under the name of Woodward-Schumacher Electric Corporation by Albert Schumacher, who served as the corporation's president and former owner. In 1971, the corporation changed its name from Woodward-Schumacher Electric Corporation to

Schumacher Electric Corporation, but the company did not sell its assets or its stock to a different corporation and it continued to honor all pre-existing contracts and liabilities. In short, the corporation changed its name but remained the same entity. Prior to 1968, Schumacher purchased the copper wire that it used to manufacture battery charging equipment and transformers from outside suppliers. In approximately 1968, Albert Schumacher established the Horning Wire Corporation ("Horning") to create a business for his daughter and son-in-law, Carol and John Horning, who became the owners of the new company. Horning transformed copper rod into copper magnet wire, which it then supplied to Schumacher, its primary customer. Horning eliminated Schumacher's reliance on outside intermediary copper suppliers to transform copper rod into wire and allowed Schumacher to meet its production needs more consistently.

From the incorporation of Horning in 1968 through at least the early 1990's, Schumacher and Horning were closely connected through family ownership, with the exception of a severing of relations during a relatively brief family disagreement between 1988 and 1989. During the early years of Horning, Schumacher included Horning as an associated company in its consolidated financial statements. The two corporations shared additional ties extending to 1990, such as Schumacher sharing employees, executing of favorable lease rates, and agreeing to subordinate a $900,000 loan to Horning in favor of Horning's debt to a third party lender.

The alleged guaranty at issue in this case originated in the early years of Horning. When Horning was initially established, Schumacher paid Phelps Dodge directly for Horning's purchases of copper rod from Phelps Dodge even though shipments of copper rod were made directly to Horning. Beginning in 1971, Schumacher requested that Phelps Dodge bill Horning directly on an open account for the copper rod that Phelps Dodge supplied to Horning. At the

time that this new billing system was being arranged with Phelps Dodge, Lester R. Hochleutner, who was the Vice President and a director at Woodward-Schumacher at the time, sent a letter to T.J. Murphy, an Assistant Secretary at Phelps Dodge.

Phelps Dodge has produced this letter from its files on Woodward-Schumacher stationery dated June 18, 1971. The letter purports to guaranty payment of any purchases of copper by Horning to Phelps Dodge. The letter, which the parties stipulated was authentic and admissible, states:

> In connection with our request to Phelps Dodge, this letter will serve as a guarantee by Woodward-Schumacher Electric Corporation of the payment of any purchases of copper by Horning Wire Corporation of Lake Zurich Illinois from Phelps Dodge Copper Products Corporation.
>
> As a result of this guarantee, we understand it is agreeable with Phelps Dodge to invoice Horning Wire Corporation for copper purchases made directly from them and this arrangement will replace billing to Woodward-Schumacher Electric Corp with shipment to Horning Wire Corporation.

The letter did not include an end date to the guaranty or provide for periodic renegotiation on the guaranty. Schumacher represents that no retained copy of the guaranty letter exists in its company files, and there is no record of the letter in the corporate minute book or audited financial statements. Mr. Hockleutner, the author of the letter, is now deceased. Schumacher further represents that no one in its current management has ever been aware of the letter. Phelps Dodge retained the letter in its corporate records system, where it languished without event until around April, 1988, when Ira Schwarzwald joined Phelps Dodge and noticed the letter during a review of company credit files. During the 1990s, Mr. Schwarzwald discussed the letter with Arthur Meile, president of the Phelps Dodge sales company, and Charles Brown, director of the

company's treasury operations. The agreed facts indicate that there was some confusion within Phelps Dodge about whether the letter constituted a guaranty that was still valid more than thirty years after it was executed. Throughout this time, no one from Phelps Dodge discussed the guaranty with anyone at Schumacher.

Horning regularly purchased copper rod from Phelps Dodge on open account from 1971 until December 31, 2000, with purchases ending shortly before Horning was dissolved in 2001. While the exact nature of the sales contract between Phelps Dodge and Horning is unclear during the early years of the company, from 1984 until 2000, Phelps Dodge and Horning entered into an annual sales contract that was renegotiated each year. During the time period that Phelps Dodge sold Horning copper wire, it adjusted Horning's credit line several times without providing notice to Schumacher. For example, in early 1990, Phelps Dodge raised Horning's credit line from $500,000 to $750,000. Phelps Dodge did not inform Schumacher of these changes or of the annual sales contracts.

On February 9, 2001, Horning made an assignment of its assets for the benefit of its creditors to David Abrams of Abrams & Jossell Consulting, Inc. Horning's assets were liquidated through this assignment, but the proceeds of the liquidation were insufficient to repay Horning's secured creditors. No funds were available to distribute to unsecured trade creditors, including Phelps Dodge. At the time of the liquidation, Horning owed Phelps Dodge $372,226.56 for copper rod received by Horning. Horning does not dispute the reasonableness or amount of Phelps Dodge's invoices.

On March 2, 2001, Phelps Dodge sent a letter to Schumacher informing the corporation of Horning's outstanding debt, reminding Schumacher of the guaranty letter from Mr.

4

Hochleutner, and demanding payment of $372,226.56 based on the guaranty. Prior to the March 2, 2001 letter, there is no evidence that anyone at Phelps Dodge ever reminded anyone at Schumacher of the guaranty letter or asked anyone at Schumacher to affirm or renew the June 18, 1971 letter.

## Discussion

Rule 56(c) of the Federal Rules of Civil Procedure provides that a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court accepts as true the evidence set forth by the non-moving party and draws all reasonable inferences in favor of the party opposing the motion. *Associated Milk Producers, Inc. v. Meadow Gold Dairies*, 27 F.3d 268, 270 (7th Cir. 1994). The party seeking summary judgment carries the initial burden of demonstrating an absence of evidence to support the position of the nonmoving party. *Doe v. R.R. Donnelley & Sons, Co.*, 42 F.3d 439, 443 (7th Cir. 1994). The nonmoving party must then set forth specific facts showing a genuine issue of material fact and that the moving party is not entitled to judgment as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). A genuine issue of material fact exists only if the evidence is such that a reasonable jury could only return a verdict in favor of the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The Court has jurisdiction over this dispute by diversity, as the parties are of diverse citizenship and the amount in controversy exceeds the statutory minimum of $75,000. 28 U.S.C. § 1332(a) (2003). A federal court exercising diversity jurisdiction applies the choice of law rules

of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The Court applies Illinois substantive law to this case; the parties do not dispute the governing substantive law. *See Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999); *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991).

Under Illinois law, the rules of contract construction apply generally to guaranty contracts. *McLean County Bank v. Brokaw*, 519 N.E.2d 453, 456 (Ill. 1988). The function of the court is to effectuate, if ascertainable, the intent of the parties to the contract. *Ricci v. Reed*, 169 Ill. App. 3d 1062, 1067 (Ill. App. Ct. 1988). When the guaranty contract is unambiguous, it is given its natural and ordinary meaning, as with any other contract. *See Irving Tanning Co. v. Am. Classic, Inc.*, 736 F. Supp. 161 (N.D.Ill. 1990); *Heritage Bank v. Bruti*, 489 N.E. 2d 1182 (Ill. App. Ct. 1986). A guaranty contract that is unambiguous must be enforced as written, even when the guaranty agreement contains broad statements of guarantor liability. *Holden v. Nat'l Blvd. Bank*, 596 N.E.2d 47, 53 (Ill. App. Ct. 1992). Subsequent acts of the parties may be considered as evidence of their intentions only if the language of a contract is ambiguous or there is a question of the parties' intentions. *McLean County Bank*, 119 Ill. 2d at 412.

The Court finds in this case that the terms of the guaranty are unambiguous on the face of the document. Under the language of the guaranty contract, Schumacher unequivocally established that it would guaranty "the payment of any purchases of copper by Horning Wire Corporation." As with contracts generally, guaranty obligations may be written so that they are subject to conditions established by the parties. *Irving Tanning Co. v. Am. Classic, Inc.*, 736 F. Supp. 161, 163 (citing, *e.g., State Bank v. Cirivello*, 386 N.E.2d 43, 45 (Ill. 1978)). The guaranty document was drafted by an officer of Schumacher, and the corporation had the opportunity to

include any terms it chose limiting the length or amount of the guaranty. If a party could have negotiated to include a specific term in a contract but failed to do so, it is bound by its bargain. *See, e.g., Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d 1233 (Ill. 1995) (ambiguities in contracts are generally construed against the drafter); *Air Safety Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 886 (Ill. 1999) (party was bound by its bargain when it was free to negotiate a contract without an integration clause but included one).

It is clear from the face of the document that Schumacher bargained for the guaranty in exchange for Phelps Dodge beginning a direct billing arrangement with Horning. Schumacher derived benefit from this contract because the new billing arrangement replaced the earlier system of indirect billing through Schumacher that had been a significant financial responsibility for Schumacher. It would be an inequitable result for this Court to allow Schumacher to reap the benefits it entered into the guaranty contract to achieve while not enforcing the bargained for obligations that were necessary to achieve those benefits.

With the issue of initial validity of the guaranty established, the Court turns to whether the guaranty should be void for other equitable considerations. Schumacher first argues that the guaranty is unenforceable because it violates the "reasonable time rule" for the duration of a guaranty contract established by the Illinois Supreme Court. Schumacher is correct that when time for performance is not provided in the contract, a reasonable time is implied. *See, e.g., Meyer v. Marilyn Miglin, Inc.*, 652 N.E.2d at 1239. In *Mamerow v. Nat'l Lead Co.*, 69 N.E. 504 (1903), the Illinois Supreme Court established that "where the guaranty is a continuing one, and is unlimited as to the duration and amount for which the guarantor will be liable, such time and amount must be reasonable, under the circumstances of the particular case." *Id.* at 507.

7

Under the circumstances of the current case, however, the Court does not think it is unreasonable for the length of the guaranty to extend for thirty years when the guarantor who drafted the document did not include a time limitation or attempt to terminate the agreement at any time after it was made. A continuing guaranty may be revoked at any time, provided due notice is given. *City Nat'l Bank v. Reiman*, 601 N.E.2d 316, 322 (Ill. App. Ct. 1992). Once a guaranty has been revoked, the guarantor's liability is limited to transactions occurring under the guaranty before notice of revocation. *Id.* Schumacher's defense that it did not maintain a copy of the guaranty contract in its records does not provide an excuse for its failure to revoke the guaranty.

A thirty year guaranty is also reasonable in this case because there is ample evidence that Schumacher received nearly continuous benefits from the guaranty agreement as a purchaser of copper wire from Horning from 1971 until its dissolution in 2001. Albert Schumacher, the founder and former owner and president of Schumacher, organized Horning specifically to manufacture and supply copper wire to Schumacher, and to create a business for his daughter and her husband. From the time that Schumacher and Phelps Dodge entered into the guaranty agreement until Horning dissolved in 2001, Schumacher's reliance on outside copper supplies was reduced and it more consistently met its need for copper wire production. When the benefits from a contract continue to accrue, the burden also continues to run.

Schumacher urges this court not to enforce the guaranty because of its age, claiming that a guaranty should only be valid for a "reasonable" period of time. While "reasonable" sounds reasonable, it provides no clarity for the parties or the law. Who determines "reasonable?" The judge? The jury? Inevitably judges and juries would differ on what time is reasonable. Under

8

the circumstances of this case, in the absence of any fraud, mistake, undue influence or lack of sophistication of the parties, it would be inappropriate for the court to depart from the literal language the parties chose to use and instead insert a "reasonable" time period, which in practice would be defined differently by different judges and juries.

Schumacher next argues that it should be released from its obligations under the purported guaranty because Phelps Dodge and Horning materially altered the relationship that the guaranty covered. As established in the stipulated facts of this case, Phelps Dodge adjusted the credit line of Horning as the company's financial circumstances fluctuated over the years. For example, in 1990, Phelps Dodge raised Horning's credit line for 1990 from $500,000 to $750,000 without informing Schumacher of the change. Schumacher argues that the increases in Horning's credit line materially altered the risk to Schumacher from its guaranty and, therefore, voided the guaranty contract. Schumacher further argues that the annual sales contracts entered into by Horning and Phelps Dodge for the purchase of copper wire also materially altered the relationship covered by the guaranty because the terms of the annual sales agreement changed from year to year.

We find that neither the increases in Horning's credit line nor the execution of annual sales contracts between Horning and Phelps Dodge constitutes a material change to the terms of the guaranty contract. Under Illinois law, "'a guarantor is not liable for anything which he did not agree to and if the creditor and principal have entered into an agreement materially different from that contemplated by the instrument of guaranty, the guarantor shall be released.'" *Grundstad v. Ritt*, 166 F.3d 867, 870 (7th Cir. 1999) (quoting *Exch. Nt'l Bank v. Bergman*, 505 N.E.2d 1236, 1238 (Ill.App.Ct. 1987). In deciding whether a material change has occurred,

9

Illinois courts determine "whether there has been a material change in risk to the guarantor because of a modification undertaken by the principal debtor and the creditor." *Bernardi Bros. v. Great Lakes Distrib.*, 712 F.2d 1205, 1207 (7th Cir. 1983) (quoting *Claude S. Corp. v. Henry's Drive-In* 201 N.E. 2d 127, 132 (Ill. App. Ct. 1964)). To determine whether a material change has occurred to the risk of the guarantor, the Court must first determine what risk the guarantor agreed to engage in.

The extent of a guarantor's liability is determined from the language of the guaranty contract. *Palen v. Cullom Capital Woodworking, Inc.*, 506 N.E. 2d 1062 (Ill. App. Ct. 1987). Generally, the specification of a maximum principal amount in a guaranty agreement indicates the intention of the parties to limit the amount of the guarantor's liability. *McLean County Bank v. Brokaw*, 519 N.E.2d 453, 456 (Ill. 1988). Under the facts of the dispute before this Court, no such maximum amount was established to cap the guaranty agreement. In the absence of an expressed intent in the contract to limit the amount of credit extended to a specified amount as a condition of the guarantor's undertaking, the extension of credit beyond the amount covered at the time the guaranty was issued does not automatically discharge or release the guarantor of liability.

Further, the Court also finds that the mere fact that Horning entered into annual sales contracts with Phelps Dodge subsequent to the guaranty agreement does not materially alter the guaranty. Under the terms of the agreement, the guaranty was a broad, continual guaranty as drafted by Schumacher that ensured "the payment of any purchases of copper by Horning Wire Corporation of Lake Zurich Illinois from Phelps Dodge Copper Products Corporation." Further, the guaranty was a forward-looking document, stating Schumacher's understanding that this

10

guaranty would allow Phelps Dodge to extend billing credit directly to Horning. It is reasonable to assume that Schumacher was aware that Horning and Phelps Dodge would work on a contractual basis for future sales of copper rod.

The parties have provided a large amount of information about whether Schumacher was aware of ongoing changes to the purchase agreements between Horning and Phelps Dodge. The defendant argues that material changes to the purchase agreement between Horning and Phelps Dodge over the years altered the purchase agreement to the extent that the guaranty no longer applied. Even if we construe the facts most favorably to the defendant and assume that Schumacher had no knowledge of the changes to the purchase agreements, it does not absolve Schumacher of its responsibility as a guarantor to engage in reasonable efforts to keep abreast of these changes.

Schumacher finally argues that the guaranty contract is void because Phelps Dodge breached its implied obligation of good faith and fair dealing. According to Schumacher, Phelps Dodge's failure to inform Schumacher of the existence of annual sales contracts between Phelps Dodge and Horning, increases in Horning's credit line, or its ongoing concerns about Horning's credit line (among other items), breached this duty. It is a valid defense to a guaranty contract that the creditor failed to notify the guarantor of facts that materially increased the risk beyond what the creditor has reason to believe the guarantor intended to assume. *McLean County Bank v. Brokaw*, 519 N.E.2d at 458 (citing RESTATEMENT OF SECURITY § 124 (1941)). This does not, however, require the creditor to take unusual steps to inform the guarantor of information that he can assume the guarantor also knows. *Id.* For example, in *McLean*, the Illinois Supreme Court found that there was no violation of the creditor bank's good-faith duty to

11

keep the guarantor, the borrower's parents, informed of their son's declining credit because the bank could reasonably assume from letters and conversations with a loan officer that the parents were aware of the situation.

In this case, the facts also demonstrate that there was a sufficiently close connection between Schumacher and Horning that Phelps Dodge could assume Schumacher was aware of the financial condition of Horning. First, until the death of Albert Schumacher in 1988, it is clear from the record that Schumacher and Horning shared a close business relationship. The ties between the two organizations included overlapping management teams, shared financial statements and unusually favorable credit terms. The stipulated facts establish that Horning was created by Albert Schumacher for the purposes of improving the copper wire supply to Schumacher and creating a business for his daughter and son-in-law to run. Second, even after the death of Mr. Schumacher, the business of the two corporations was sufficiently intertwined to give Schumacher notice of facts about material increases to its risk. For example, the $250,000 increase in Horning's credit line from Phelps Dodge in 1990 was the reasonably foreseeable result of Schumacher forgiving more than $500,000 in outstanding promissory notes executed by Horning to Schumacher as part of a settlement agreement between the two companies that occurred during the same time period. It was reasonably foreseeable from this change in Horning's debt that its credit availability would increase.

The final matter before the court in this motion is whether interest should be applied to the principal amount guaranteed under the contract. When the contract does not expressly address interest, prejudgment interest may be charged on a guaranty if the principal amount due is fixed or easily computed. *Ricci v. Reed*, 523 N.E.2d 1218, 1222 (Ill.App.Ct. 1988), 1068,

12

*Cushman & Wakefield, Inc. v. Northbrook 500 Ltd. P'ship*, 445 N.E.2d 1313, 1321 (Ill. App. Ct. 1983). Here, the principal amount could be easily anticipated and computed by Schumacher when making the guaranty because it previously had directly purchased the copper wire itself. Further, the value of the principal amount under Schumacher's guaranty can be easily computed using the undisputed invoices Phelps Dodge has provided that demonstrate Horning received copper rods valued at the amount claimed under the guaranty. As a result, the Court awards plaintiff interest on the guaranty.

## CONCLUSION

For all the foregoing reasons, we grant the plaintiff's motion for summary judgment (#22-1) and deny the defendant's cross-motion for summary judgment (#23-1). The court orders the defendant to pay $372,226.56 plus interest. This is a final and appealable order. This case is hereby terminated.

Wayne R. Andersen
United States District Judge

Dated: March 8, 2004